HEARD NOVEMBER TERM, 1875.

## BASS *vs.* LUCAS.

At a sale of the real estate of a decedent made by a Commissioner in Equity under a decree for partition, B, who was one of the distributees and also the committee of C, another distributee, a lunatic, became the purchaser of two separate parcels of the lands sold, and gave to the Commissioner a separate bond for the price of each parcel and one mortgage of both parcels of land to secure the payment of both bonds. The Commissioner afterwards, in settlement with B of his own and C's shares of the estate, extinguished the larger of the two bonds, and then, in settlement with P, another distributee, assigned to him the other bond and the mortgage. Under a decree obtained by P for foreclosure of the mortgage, E became the purchaser of the land: *Held,* That C had no equity to subject the land in E's hands to the payment of his share of the estate, and this whether E knew the circumstances of the case or not.

After B's purchase of the land he sold part of it to K and took from him a bond and mortgage of that part to secure the payment of the purchase money. B assigned K's bond and mortgage to E, who, under a decree for foreclosure of K's mortgage, purchased that part of the land also: *Held,* That, there was no equity to subject this part of the land to C's claim.

B, at the time he became the purchaser of the two parcels of land, had no funds to invest belonging to C, and an intention on his part to hold the lands as an investment for C could not give the latter an equity to subject the same to the payment of his share of the estate as against E, the purchaser at the sales for foreclosure.

BEFORE TOWNSEND J., AT DARLINGTON,　　　　　TERM, 1875.

This was an action by James· E. Bass, as administrator of Charles Lucas, deceased, and others, against George W. Lucas, Benjamin W. Edwards and others, defendants, to subject real estate of which the defendant Edwards had become the owner to certain alleged trusts in favor of the said Charles Lucas.

The case is sufficiently stated in the complaint and answer of the defendant Edwards, which are as follows:

The complaint stated that Charles Lucas, of the said County and State, died on the _____ day of November, 1865, and that the plaintiff, James E. Bass, was appointed administrator of his personal estate on the 16th day of March, 1868; that the plaintiffs, Lula E. Lucas and Sarah K. Lucas, were infants, and that Wiley K. Bell had been duly appointed their guardian *ad litem* on the 5th September, 1871; that Benjamin Lucas, of the same County and State, died intestate on the 12th day of February, 1861, leaving a considerable estate, real and personal, and the following named persons as his distributees and heirs-at-law, to wit: George W. Lucas, Charles Lucas, Mary A., wife of John F. Parrott, Sarah L., wife of Jesse H. Windham, Margaret J., wife of George H. Carraway, and Kimbrough D. Lucas, who died intestate in 1862, leaving two children, the infant plaintiffs named, who were entitled to represent him in the distribution of Charles Lucas's estate; that George W. Lucas and Kimbrough D. Lucas took out administration on the 5th day of March, 1861, and, as administrators, distributees and heirs at law, filed their bill against the other distributees on the 19th of November, 1861, for account and partition, describing in said bill, as part of the land of which intestate died seized, the tract on which he resided, on the waters of Black Creek, "containing nine hundred and eighty-six acres;" that under said bill a writ of partition issued, to which return was made on the 31st day of November, 1861, wherein it was recommended that all the real estate of said intestate be sold, the one on which said intestate lived to be sold in two tracts, the road leading from Society Hill to Darlington Court House being the dividing line, on the following terms, to wit: sufficient to pay costs and expenses cash, balance on a credit of one, two and three years, with interest annually from date, purchasers to give bond with two sureties and mortgage of the premises, which return was confirmed 27th November, 1861, and reaffirmed on the 1st of January, 1862; that the Commissioner reported, 11th February, 1862, that he sold the home tract of land as ordered, in two tracts, on sale day in January past—that East of the public road, of five hundred and twenty-four acres, as per survey, to G. W. Lucas for $5,764, being eleven dollars per acre; that West of the road, of four hundred and thirty-two acres, for $6,224, being four-

teen dollars and fifty cents per acre, also to G. W. Lucas, which report was confirmed 11th February, 1862. That the Commissioner took from G. W. Lucas two bonds, one for $5,764, the other for $6,224, dated 6th January, 1862, and one mortgage of same date to secure the payment of the land described as containing nine hundred and fifty-six acres, more or less, being represented by a plat accompanying. That the smaller of said bonds, after the payment of large sums thereon by G. W. Lucas, together with said mortgage, was assigned to John F. Parrott on the 3d June, 1863, the larger of said bonds previously, to wit, the 16th of January, 1863, having been given up to G. W. Lucas in the distribution of the estate of Benjamin Lucas. That the administrator's accounts having been audited and sales made as aforesaid, all the parties interested in the estate of Benjamin Lucas agreed, in writing, to a distribution of the funds in Court and in the hands of G. W. Lucas, surviving administrator, in conformity to a distribution sheet prepared by the Commissioner, which shows each party's share to be $5,468.88½, two of which shares were paid to G. W. Lucas, one his own and the other the share of Charles, by crediting the aggregate, to wit, $10,937.77, on the amount of his indebtedness to said estate, which indebtedness was $16,699.64. This settlement bears date 16th January, 1863.

That on the 22d June, 1861, G. W. Lucas filed a petition stating the incapacity of his brother Charles Lucas to manage his affairs, which was of thirty years' standing, and praying a commission in the nature of a writ *de lunatico inquirendo*, for inquiry as to the alleged unsoundness of mind; and thereupon, on the 17th January, 1862, an inquisition was filed in Court, which found the truth of the statements in said petition, and (upon petition filed for the purpose) an order was passed by the Court appointing G. W. Lucas committee of the person and estate of Charles Lucas, on his entering into bond in the penalty of ten thousand dollars, which order bears date 11th February, 1862, and with which G. W. Lucas complied, but that he and the sureties on his bond were insolvent (at the filing of this complaint). That the infant plaintiffs, G. W. Lucas, Sarah L. Windham, Mary A. Parrott, Margaret J. Carraway, were the distributees of Charles Lucas, and that G. W. Lucas, as committee of Charles, had never paid to plaintiffs or the other parties in interest any portion of the estate of said Charles which went into his hands as committee. That on the 21st of December,

1868, John F. Parrott filed his bill in said Court against G. W. Lucas, with whom was afterward joined Erasmus G. Kirven, (purchaser of a portion of said mortgaged lands,) praying that an account be had of the amount due on a bond assigned as aforesaid, and in default of payment thereof by G. W. Lucas the premises mortgaged as aforesaid might be sold to make payment. That on the 24th October, 1870, it was ordered that G. W. Lucas do pay to John F. Parrott $1,008.12, with interest from 6th October, 1869, by first of February next after, or in default thereof that the mortgaged premises described be sold by the Clerk of the Court on the next or some other sale day thereafter for one-third cash, balance on a credit of one year, with interest annually, to be secured by bond and mortgage of the premises, and that the defendants be forever barred of any equity of redemption, and that the proceeds of sale be applied to costs of proceedings and expenses of sale, and then in payment of complainant's claim, and that any surplus be paid to defendants. That on 29th May, 1871, the Clerk of the Court reported that he had sold the mortgaged premises under the last named case on the 1st February then past in four lots, in all seven hundred and fifty-eight acres, being one hundred and ninety-eight acres less than the amount described in said mortgage. That the whole amount of sales was $2,092.87; that the one-third was paid in cash; that Benjamin W. Edwards was the purchaser of all the lots, and that he had complied with the terms of sale, and titles of the whole had been executed to him; which report was confirmed on the day of its date. That a considerable surplus from said sale, liable by terms of the order recited to be paid to G. W. Lucas or Erasmus G. Kirven, still remained in Court. That plaintiffs were ignorant of the disposition of the cash payment, but charged that it was paid over to John F. Parrott. That G. W. Lucas invested the whole of Charles Lucas's share in Benjamin Lucas's estate, in the lands contained and described in said mortgage; and that G. W. Lucas and his sureties being insolvent, and he never having paid them anything on account of their interest in Charles Lucas's estate, the distributees of said Charles were entitled to the sale of said lands to satisfy their claim. That John F. Parrott, E. G. Kirven and B. W. Edwards had notice of the investment by said committee, when made on 16th January, 1863. That said distributees had also a right to an account from J. F. Parrott, E. G. Kirven and B. W. Edwards of the rents and profits,

as well as the moneys arising from sale of said mortgaged premises; that they, as well as the committee, were trustees for the distributees of Charles Lucas, having dealt with the trust estate with the knowledge of the trust; and demanded :

1. That G. W. Lucas, as committee of Charles, account for the funds which went into his hands as committee, and pay the amount found due into Court.

2. That upon his failure to pay the amount found, said lands to be sold to satisfy the same.

3. That said G. W. Lucas, J. F. Parrott, E. G. Kirven and B. W. Edwards each account for the rents and profits of said lands, and for all moneys which had or might come into their hands or possession, or under their control, growing out of said lands or arising from the sale thereof.

4. That the funds in Court be retained to meet the demands of the distributees of Charles Lucas; and,

5. For other relief.

The answer of B. W. Edwards, not admitting the present insolvency of the bondsmen of G. W. Lucas as committee of Charles, asserted that they were solvent when the bond was taken and the share of Charles was paid over; that on the 20th day of February, 1862, E. G. Kirven purchased 198 acres of the land bought by G. W. Lucas at the sale of Benjamin Lucas's estate, (on the West side of the road,) and on the same day gave G. W. Lucas bond and mortgage to secure the purchase money, which 198 acres of land were not sold under foreclosure of John F. Parrott's mortgage; that said bond and mortgage of E. G. Kirven were assigned by G. W. Lucas to a creditor who was not charged with notice, and that under proceedings by the assignee to foreclose said mortgage a sale was had subsequent to the filing of the complaint and B. W. Edwards became the purchaser thereof; that he admitted that the proceeds of sale, under the foreclosure of John F. Parrott's mortgage, were in excess of the amount due him, but denied that the excess or surplus was in Court or was answerable to plaintiffs' demand, alleging that under the order of Court the surplus was payable to G. W. Lucas, and that at the time of the sale the said Lucas was indebted to said Edwards in a sum largely exceeding said surplus, which was and still is a valid discount in favor of

Edwards against said surplus by reason of the order of Court, and that Lucas admitted it so to be, and agreed that it should be so regarded and treated; that he did not admit the investment by G. W. Lucas of Charles's interest in lands, and could not see that he could have done so, as his purchase of the lands was anterior to his receipt of Charles's property; that he denied that John F. Parrott or E. G. Kirven could have had notice of such investment, and most positively denied that he himself had notice of the investment of Charles Lucas's share of his father's estate in lands; but alleged, on the contrary, that all the information that ever came to him concerning the matter was well calculated to convince him that no such investment was made; he was Commissioner in Equity at the time of the partition of Benjamin Lucas's estate, and under agreement of the parties he distributed the proceeds of the sale of the real and personal estate, the choses in action and money in hand, among the distributees; that he knew G. W. Lucas received his own share and that of his brother Charles from personal assets thrown into the distribution by agreement, as well as from proceeds of sale of the real and personal estate, as the distribution sheet shows; that G. W. Lucas treated the share of Charles as so much money, and that in his first annual return after receiving it, as committee of Charles, (which return was sworn to before and received and recorded by him, Edwards, as Commissioner in Equity,) he charged himself with so much money as *corpus*, and in all his succeeding returns continued so to charge himself, and submitted:

1. That he was a purchaser without notice of any trust under proceedings to foreclose the mortgage assigned to John F. Parrott; and that if any trust did arise by reason of the manner in which G. W. Lucas paid his larger bond, he could not be affected thereby.

2. That, as purchaser of the 198 acres sold by Lucas to Kirven, he could not be affected by any such trust as was set up by plaintiffs, as he had no notice of any such trust; and Kirven could have had no notice of a trust alleged to have arisen long after the date of the mortgage given by Kirven to secure the purchase money of the 198 acres, under which mortgage he, Edwards, was a purchaser.

3. That the balance due by him on the bond, which balance was ordered to be paid to G. W. Lucas, was subject to be discounted by valid claims which he held at the time the order was made and still held against G. W. Lucas, and that G. W. Lucas long since agreed that it should be so discounted.

His Honor the presiding Judge heard testimony and the arguments of counsel, and then made a decree, in which, after stating the case, he proceeded as follows:

TOWNSEND, J. The first question that presents itself for consideration is: Did G. W. Lucas, as committee of Charles Lucas, invest the share of Charles Lucas in the estate of Benjamin Lucas in the lands purchased at the sale made by the Commissioner? E. G. Kirven, a witness for the plaintiffs, testified that he had a conversation with G. W. Lucas before the sale, and G. W. Lucas said to him that he intended to become the trustee of Charles Lucas and take his part in land. He says Lucas told him this several times, and he remembers his saying so on the day the land was run out. He further says that G. W. Lucas asked him to go on his bond for the purchase money of the lands, and remarked that he intended to take his brother Charles's share in land, and the land would be good for the bond. Kirven did become one of the sureties of G. W. Lucas on his bonds. Kirven further testifies that G. W. Lucas did not point out the land in which he intended to put the money of Charles Lucas; that it was understood, on the day the land was surveyed, that Kirven was to get one hundred and ninety-eight acres of it, and in about one month after the sale the land was conveyed to him by G. W. Lucas. Kirven says he was not at the sale, and that the lands brought a full price. He further testifies that he signed the settlement sheet in January, 1863, as trustee for one of the distributees.

G. W. Lucas, one of the defendants, and a witness, testified that he did not inform E. G. Kirven that he intended to invest the share of Charles Lucas in land, or that he told him that if he would go on the bond he would be safe, as the share of Charles Lucas was to be put in the land and the land would be good for the bond. He further testified that he did not invest any of Charles Lucas's share in the land, but received it in money, and always regarded it in that shape in his hands. He further testified that he purchased the lands for himself, and at the time was in prosperous circumstances and had a large property.

A. C. Spain, Esq., a witness for the plaintiffs, testified that John F. Parrott came to him to aid in the institution of proceedings against Edwards and G. W. Lucas, and stated that he knew G. W. Lucas had invested the share of Charles Lucas in the lands, but

did not say in what particular lands. The statement was made to witness after the sale of the land under the mortgage to Edwards.

It appears from the pleadings and the testimony that the lands of Benjamin Lucas were sold in two tracts, in accordance with the recommendations of the Commissioners in partition, and that one of the tracts brought $6,224, and the other $5,764. The settlement sheet shows that the share of Charles Lucas in the estate of his father was $5,468.88½. Charles Lucas, at the time of the sale, was a lunatic, and had been during his whole life, and was living with G. W. Lucas; was received by way of a credit on the bond of G. W. Lucas in January, 1863. This was during the late war, when it was known as an historical fact that Confederate money was the only currency and values of any kind were considerably inflated. G. W. Lucas was appointed committee of Charles Lucas in 1861, and the sale did not take place until January, 1862.

If the witness Kirven is entitled to credit, G. W. Lucas evidently expressed an intention, more than once after his appointment as committee, to invest the share of Charles Lucas in some of the lands belonging to the estate of Benjamin Lucas. Was this intention carried into effect? It would seem so, if the declarations of J. F. Parrott made to A. C. Spain are true. Parrott denied on the stand any knowledge of such an investment, but stated that he did not recollect what had passed between him and Mr. Spain. The witness Spain undoubtedly heard the declarations he testifies to, and the fact that Parrott did not deny having made them is an admission in effect that G. W. Lucas did make such an investment of the share of Charles Lucas. All the circumstances of the case go to show that the declarations of Parrott are true and the execution of the intention expressed to Kirven before the sale. Before the survey of the lands, and certainly before the sale, G. W. Lucas files his petition and obtains the appointment of committee of Charles Lucas. Why this haste to secure this appointment before the estate had been sold and the proceeds are ready for distribution? The only reasonable solution is, that G. W. Lucas desired to purchase the lands, and wished to become the committee before the sale to enable him to use the share of Charles Lucas in making payment in part of the purchase money. Why was the tract of land sold in two parcels? It is true it was upon the recommendation of the Commissioners; this was based upon something, and the presumption is fair that the representations and desire of G. W.

Lucas, the administrator of the estate, influenced the Commissioners in their action. If such was the case, why did G. W. Lucas wish the land sold in two parcels? The only reasonable answer to this inquiry is, because he desired the one tract for himself and the other for his brother, Charles Lucas. It was but natural that he should wish the share of Charles Lucas well invested, on account of his condition and the likelihood that he would be a charge upon him the residue of his days, and at that time land was considered safe when a permanent investment was contemplated. The land was so divided that one of the tracts brought at the sale only a small amount over the ascertained share of Charles Lucas. The other tract sold for about the share of G. W. Lucas, after the sale of a portion of it to Kirven. This indicates that calculations were made, and the amounts paid for the tracts of land were then probably fixed upon before the sale. The lands were sold on a credit of one, two and three years. In January, 1863, one year after the date of the sale, G. W. Lucas paid much more than the instalments due on the bonds. The amount due by estimation was about forty-four hundred dollars, and yet Lucas paid over ten thousand dollars on the bonds. Why was the large payment made if the share of Charles Lucas was not to go in the land purchased by G. W. Lucas? The larger bond is canceled and surrendered, and the smaller, with the mortgage, left in the hands of the Commissioner. This act was significant. G. W. Lucas either paid the larger because he considered the money of Charles Lucas invested in the tract for which it was given, and he desired to disencumber it, or he left the smaller bond, if it was given for the land in which he intended to invest the fund of his brother, for the purpose of disencumbering his own bond and leaving that bought with Charles's fund to take the chances of another sale by a foreclosure of the mortgage to satisfy the balance due on the bond.

The only testimony to prove that there was no investment of the share of Charles Lucas in the land is that of G. W. Lucas himself. The denial by him is not sufficient to outweigh the other testimony and the circumstances in the case. He has lost the lands and may be anxious for some means to protect the party now in possession of them. The further fact was relied upon in argument, that G. W. Lucas always returned the estate of Charles Lucas as money in his hands. This may be true, and yet it furnishes but little evidence on the point. The settlement was made in

1863. The first return was probably made in 1864. At that time the Confederate currency had vastly depreciated and was not a very current medium of exchange. G. W. Lucas no doubt knew this, as any one of this State must have known, and it was very convenient for his interest to report the share of Charles Lucas in money of a depreciated kind, and to consider the land, which had an intrinsic value, as his own property. Many persons occupying fiduciary relations did this. This fact, then, in connection with the denial of G. W. Lucas, cannot overthrow the testimony of Kirven and the other facts and circumstances in the case.

I am of the opinion that G. W. Lucas did invest the share of Charles Lucas in his father's estate in land. It is difficult, from the testimony before me, to fully identify the particular land. The circumstances of the case point to the fact that it was the tract containing four hundred and thirty-two acres; this was the smaller tract. The bond given for it was canceled and surrendered to G. W. Lucas. The smaller bond was left, and was afterward assigned in payment of a portion of a distributive share due to the wife of John F. Parrott. The surrender of the large bond was probably at the instance of G. W. Lucas, and also the assignment of the other bond to Parrott. This was done to relieve the land of Charles Lucas from an encumbrance, as G. W. Lucas felt it was his duty to do. It is my judgment that the share of Charles Lucas was invested in the tract of land containing four hundred and thirty-two acres.

But suppose there was no purchase of the land by G. W. Lucas at the sale for Charles Lucas, and no investment at that time of the share of Charles; yet it is a fact admitted by all the parties that G. W. Lucas employed the funds of his brother in payment of one of his bonds given for the purchase money of the smaller tract of land. The fund was thus used in purchasing land; and if a fiduciary relation subsisted between G. W. Lucas and Charles Lucas, the property thus purchased will be impressed with the character of the trust.

"It is a general rule, established to keep trustees in the line of their duty, that they shall not derive any personal advantage from the administration of the property committed to their charge."— Lewin on Trusts, 318.

"A trustee is never permitted to make any profit to himself from the management of the trust estate."—Story, 322.

"A trustee cannot make any advantage to himself in the management of the trust estate."—*McNeil* vs. *Morrow*, Rich. Eq. Cases, 174.

"A trustee cannot act for his own benefit on a contract in the subject of his trusts."—1 John. Ch., 397.

What was the relation existing between G. W. Lucas and Charles Lucas at the time of the payment of the bond? It was clearly a fiduciary relation. G. W. Lucas held the office of committee, and was a trustee for Charles Lucas, and the duties to be performed by him were those of a trustee.

If G. W. Lucas was a trustee at the time he receipted for the share of Charles Lucas, and availed himself of the benefit of his property in the payment of the purchase money for land, he is clearly not entitled to make a profit to himself in this way. The property thus purchased with the trust funds will be subject to the trusts. When there has been a misapplication of the trust fund, the Court will fasten a trust upon the land or other property in favor of the person beneficially interested in the money.—Story, 1210; *McNeil* vs. *Morrow*, Rich. Eq. Cases, 172.

If a trustee should misapply the funds of his *cestui que trust*, the latter would have an election either to take the security or the property in which the funds were wrongfully invested, or to demand payment from the transfer of the original funds.—Story, § 1211; *McNeil* vs. *Morrow*.

In this case the share of Charles Lucas was credited upon the bond of G. W. Lucas. The share, therefore, was used by G. W. Lucas in the payment of his larger bond, given for one of the tracts of the land, and was for his advantage, and the distributees of Charles Lucas can claim the land into which it can be traced or demand the amount of the trust fund from the trustee.

The case above cited of *McNeil* vs. *Morrow* holds this doctrine and seems to be decisive of this case. In this case there was the relation of guardian and ward, and yet it was held that the negro slaves were subject to the trust and could be sold for the benefit of the ward.

I cannot perceive any strength or merit in the position assumed in the argument that a guardian has the right to retain the funds of his ward and pay interest annually upon the same, and, therefore, the committee, G. W. Lucas, had that right. Perhaps if he had received the share of the lunatic in money, and had never in-

vested it in property for his own benefit and advantage, then the position would be tenable. But in this case the fund can be traced into property, and there is no evidence that it was ever withdrawn and retained in the shape of money by G. W. Lucas.

Looking at this case in any aspect, I am of the opinion that the tract of land for which the larger bond was given should be considered the trust property of Charles Lucas, and there is an equitable claim or lien upon it in favor of the distributees of Charles Lucas to the extent of the trust funds invested in it.

But before it can be adjudged subject to sale for the satisfaction of this claim, it must be considered whether other parties have a superior equity or claim to the plaintiffs. The defendant, J. F. Parrott, claims that his lien under the mortgage assigned to him is superior. This mortgage was given to secure the payment of the purchase money of the two tracts of land sold to G. W. Lucas. It was the duty of the Commissioner to have taken two mortgages; this he neglected to do for some reason. When the larger bond was paid, there was an extinguishment of the mortgage *pro tanto.* When it was assigned to J. F. Parrott, there was an assignment of the mortgage only upon the tract of land for which the particular bond assigned to him was given. Parrott certainly had notice of the payment of the larger bond and the investment of the share of Charles Lucas in the tract for which it was given. He was present when the settlement was made; no doubt saw the surrender of the bond to G. W. Lucas, assented to everything, and afterwards told Mr. Spain of the said investment of the share of Charles Lucas in the land. He has, therefore, no higher equity than the distributees of Charles Lucas upon the smaller tract of land. The tract of land for which the bond assigned to J. F. Parrott was given could have been properly sold under a proceeding for the foreclosure of the mortgage, and a sufficient amount of the funds arising from the sale to pay the bond and mortgage would have been properly applicable thereto. Both tracts, however, were sold; the smaller one should not have been.

It is the judgment of the Court that John F. Parrott must obtain satisfaction of his bond and mortgage out of the tract of land for which the bond was given, and is not entitled to have satisfaction out of the other tract; and that the purchaser Edwards has acquired a valid title to the tract of land for which the bond assigned to Parrott was given by virtue of his purchase, and also to the other

tract, provided he had no notice of the investment of the share of Charles Lucas in this tract and of the claim of his distributees, or has not invested himself with the duties and responsibilities of a trustee by dealing with the trustee in regard to this particular tract, which was trust property.

Did Edwards have notice sufficient? What kind is necessary? Either actual or constructive, I think, will do. If a trustee sell to a *bona fide* purchaser without notice, such purchaser will not be bound by the trusts.—*Smith* vs. *Rutledge*, 1 McC., 119.

A person affected with notice may safely purchase from and protect himself under another destitute of notice.—2 Hill Ch., 423.

Whenever it appears that the purchaser knew that the trustee was applying the fund to his own use, he is *prima facie* concurring in a breach of trust, and the *onus* of proof of justification of the trustee is on the purchaser.—*Rhame* vs. *Lewis*, 13 Rich. Eq., 330.

Edwards denies any notice of the investment of the share of Charles Lucas in the land. It appears he was present when the settlement was made; was the Commissioner who sold the land, and was also the attorney for the estate of Benjamin Lucas. The settlement sheet was made out by him. The receipt from G. W. Lucas of the share of Charles Lucas was taken by him, and, with his full knowledge, the amount of same was credited upon the bond of G. W. Lucas. The larger bond was surrendered to Lucas. Edwards was fully cognizant of everything connected with the settlement of the estate of Benjamin Lucas. He evidently knew that G. W. Lucas was using the funds of Charles Lucas to pay his bond given for the land, and he is therefore to be considered as *prima facie* concurring in the breach of trust. He has not made proof of justification of the trustee as required by the case before recited, and, under all the circumstances, having come into possession of the tract of land as trust property, with full knowledge of it, I think he ought to be considered as a trustee, or as a purchaser with full notice of the trusts attaching to the property.

Kirven testified that G. W. Lucas told him he intended to invest the share of Charles Lucas in the land, and with this declaration, and what subsequently occurred with his cognizance and consent, he certainly had sufficient notice of the trusts and cannot be protected.

The proof is that the bond of G. W. Lucas, as committee, is now worthless by reason of the insolvency of G. W. Lucas and the

sureties. Nothing could, therefore, be recovered by the institution of suit upon the same. Edwards has no equity upon which to base a claim that the plaintiffs, by reason of allowing the bond to become worthless, should now look to that for the recovery of Charles Lucas's estate. Besides, the distributees of Charles Lucas had the right of election. They could either pursue the property into which the trust fund could be traced or attempt to recover the original bond out of the committee. They have elected to pursue the property, and this is a right which cannot be defeated by Edwards.

G. W. Lucas claims, in his answer, that he has accounted, but has never paid over the amount found to be due by him as committee. I presume the accounting, alluded to in the answer, is the final return made by him to the Court of Equity. This is not conclusive at all. He should account for the moneys received by him on account of Charles Lucas, and the amount so found due will constitute the estate of Charles Lucas.

It is the judgment of the Court that George W. Lucas has never accounted as committee of Charles Lucas; that the share of Charles Lucas in the estate of his father was invested in part, or used by G. W. Lucas for his benefit, in the tract of land purchased by said Lucas at the sale made by the Commissioner in Equity, containing 432 acres; that the distributees and heirs at law of Charles Lucas have a claim or lien upon said tract of land by reason of the investment of the funds of Charles Lucas in the same; that John F. Parrott, under the bond and mortgage assigned to him, was only entitled to a lien by reason of the mortgage upon the other tract of land sold ; that E. G. Kirven and B. W. Edwards had sufficient notice or knowledge of the investment of the share of Charles Lucas in the tract of land before mentioned to defeat their claim or equity of a purchaser without notice; and that the tract of land in which the funds of Charles Lucas have been traced should be sold and the proceeds distributed among his heirs at law, if the amount found to be due by G. W. Lucas on an accounting is not paid to them by him.

It is therefore adjudged and ordered that G. W. Lucas do account before the Clerk of this Court for his actings and doings as committee of Charles Lucas, and the said officer do ascertain and report to the Court the amount found to be due.

It is further adjudged and ordered that if the amount so found to be due by G. W. Lucas is not paid to the administrator of Charles Lucas on or before the first day of May next, that the tract of land containing four hundred and thirty-two acres, now in the possession of B. W. Edwards, be sold by the Sheriff of Darlington County on the first Monday in June next, for one-third cash, and the balance of purchase money on a credit of one and two years, with interest from day of sale payable annually, the purchaser to give bond and a mortgage of the premises to secure the payment of the credit portion of the purchase money; and that the cash received and the bond taken with the mortgage be turned over by the Sheriff to the Clerk of the Court for distribution among the parties entitled to the same, according their respective legal rights.

It is further adjudged and ordered that the sale heretofore made by the Sheriff under the proceedings instituted by J. F. Parrott for the foreclosure of the mortgage held by him as assignee shall stand and be regarded as valid so far as the tract containing five hundred and twenty-four acres is concerned, and that after the payment to J. F. Parrott of the amount due on the bond and mortgage the balance of the proceeds of the tract shall be paid over by the Clerk of the Court to B. W. Edwards.

It is further adjudged and ordered that the costs of this action be paid by the defendant, G. W. Lucas.

It is further ordered that the parties have leave to apply for any further orders necessary to carry into effect this decree.

The defendant, B. W. Edwards, appealed.

*McIver*, for appellant:

The only questions pertinent to this appeal are:

1. Was the share of Charles Lucas in his father's estate invested by his committee in real estate?

2. If so, in what particular piece of real estate?

3. If the share of Charles was invested in the tract of four hundred and thirty-two acres, as adjudged by the Circuit decree, has Edwards the right to the benefit of his plea of a purchase for valuable consideration without notice?

4. If Edwards had notice, did those under whom he claims, Parrott, Kirven, Parker & Kelly, have notice?

5. If it should be held that Edwards had such notice as would defeat his plea of purchase without notice, then would not equity require that all the sales at which Edwards bought should be set aside, and all of the land ordered to be resold and the proceeds applied in such a way as to meet the equities of the case?

6. If it should be held that the trust funds went into the smaller tract of land and that Edwards had sufficient notice thereof, can that part of said tract, the one hundred and ninety-eight acres, sold to Kirven, be subjected?

Then, after pointing out certain errors of fact in the decree, he proceeded as follows:

The party who undertakes to follow trust funds must be able to trace them *distinctly*, and show in what particular property they were invested, by clear and satisfactory evidence.—2 Story Eq., §1210; *Oliver* vs. *Platt*, 3 How. U. S. Rep., 333; *McNeil* vs. *Morrow*, Rich. Eq. Cases, 175.

It has not been *distinctly* shown that any trust funds went into the purchase of the lands in question. It is denied, as we have seen, by Edwards, G. W. Lucas and Parrott, in their answers and in their testimony. The testimony of Spain, as to what Parrott told him, is reconcileable with his denial; for this conversation was *after* the sale to Edwards, and Parrott might *then* have had notice, and yet had no notice before and at the time of the sale; and notice *after* the sale would amount to nothing.

The only evidence relied on to show that the trust funds went into this land, is: 1. Testimony of Kirven, which is contradicted by G. W. Lucas, and was at most a mere declaration of intention, which might not have been carried out. 2. The fact that in the settlement of 16th January, 1863, the larger bond was given up to G. W. Lucas, and he receipted for his own and Charles's share. This does not prove that Charles's share was used to pay this bond. It was not sufficient in amount for the purpose, while the share of G. W. Lucas, added to the money paid by him, was more than sufficient. Charles's share was used to pay balance due by G. W. Lucas, as administrator, and hence it was, as we have seen, charged as cash in the returns of G. W. Lucas, as committee.

But is it shown distinctly into which particular tract of land the trust funds went? It is admitted by the Judge, as we have seen, that it is difficult to identify the particular land. It could not

have been the larger tract—certainly not the whole of it—for one hundred and ninety-eight acres of it had been sold to Kirven before the transaction from which the investment is argued took place, in accordance with an understanding had with Kirven, at the very time when Kirven says G. W. Lucas expressed his intention to invest his brother's share in land. This intention, therefore, could not have embraced the one hundred and ninety-eight acres, which. was very soon afterwards, and before any investment of trust funds is even claimed to have been made, conveyed to Kirven, 20th February, 1862; and it was clearly an error to subject the one hundred and ninety-eight acres.

Did Edwards have notice? No one testifies that he had, and he denies it in his answer and in his testimony.

It is argued that Edwards had notice, because he was the Commissioner who made up the settlement sheet of 16th January, 1863; that, however, did not show that any trust funds went into the land. On the contrary, the return made that day negatived such an idea. The Act of 1840, (11 Stat., page 159,) required trustees, &c., in making their returns, to state "the particulars and value" of the estates in their hands. All subsequent returns showed the same thing. Edwards knew the trustee to be a man of large means, able at any time to pay the amount with which he charged himself as cash in his returns. He heard of no objection at either of the sales under which he purchased, though these very parties lived in the County, and the sales were duly advertised.

If Edwards had notice, and those under whom he claims had no notice, that will be sufficient to protect him.—Hill on Trustees, *165; Notes to *LeNeve* vs. *LeNeve*, 2 W. & T. Lead. Cas. Eq., 131; *Massey* vs. *McIlvaine*, 2 Hill Ch., 423.

Edwards claims, first, under Parrott mortgage, which certainly was a lien upon the whole of the land—both tracts.

He also claims under Kirven mortgage, which was given before the settlement of 16th January, 1863.

And he also claims under the mortgage to Parker and Kelly, who are not even charged with having had notice.

The Parrott mortgage was certainly superior to any claim of the plaintiff, and this seems to be admitted; but it is said that this mortgage must be confined to the larger tract—the one on the East side of the road. Why? Where is the authority for such a position? Suppose the tract on the East side of the road is not sufficient

to satisfy this mortgage—is not the holder entitled to enforce his lien on the other tract? The Court cannot know until it is tested by a sale of the larger tract, separately, whether it will yield a sufficient amount to pay this mortgage.

As to the one hundred and ninety-eight acres sold to Kirven, it certainly cannot be subjected, because it was sold before there was any pretense that the trust funds had been used, and the mortgage on it was transferred to Parker and Kelly, who certainly had no notice; and under this mortgage it was sold and bought by Edwards.

If, however, the whole or a part of the four hundred and thirty-two acre tract is to be subjected, then does not equity and justice require that a resale of the land sold under the Parrott mortgage should be made? For, by the sale already made, that mortgage has got the benefit of the sale of both tracts, whereas it would now be held that it was only entitled to one, and Parrott may have got his money, for aught the Court knows, out of the wrong tract. In other words, Edwards has had to pay for the four hundred and thirty-two acre tract under the Parrott mortgage, and is now to be required to pay again for the same tract. It may be that the sale of the tract which the Judge says is alone liable under the Parrott mortgage was not sufficient to pay that mortgage, and, if so, then Parrott has got money which ought to go to the trust estate. The only way to rectify matters, if the principles of the Circuit judgment are to be sustained, would be to set aside the previous sales and order a resale of the two tracts separately—the proceeds of the one to go to the Parrott mortgage, and the proceeds of the other to the trust fund.

*Spain,* for plaintiffs.

*Warley,* for J. F. Parrott, one of the defendants.

March 15, 1876. The opinion of the Court was delivered by

WILLARD, A. J. One of the leading objects of the complaint was to charge certain lands, in the hands of the defendant, Edwards, with certain equities, in favor of the representatives of the estate of Charles Lucas, deceased, a lunatic. They claim, in substance, that Edwards acquired such lands through G. W. Lucas, the committee of the person and estate of Charles Lucas, with notice of the fact

that Charles Lucas had an equitable claim to said lands, and, accordingly, subject to such equity.

The defendant, Edwards, purchased all but one hundred and ninety-eight acres of the land in question, at a sale under a decree of foreclosure under a mortgage, which he claims to have given him a legal title, and an equity superior to the equity alleged by the plaintiffs, as it regards the whole tract so purchased.

It is necessary to look into the rights of the original mortgagee in order to see what those rights were at their inception, and whether capable of being affected by any equity arising out of the relations of the committee to Charles Lucas, while in the hands of such original mortgagee, or in the hands of J. F. Parrott, his assignee, who foreclosed the mortgage.

It will then be necessary to inquire whether the purchaser of the lands under foreclosure, Edwards, was affected by knowledge of any circumstances tending to preclude him from acquiring that interest in the lands which the mortgage, by its terms, assumed to create.

What, then, was the nature and extent of the interest acquired by the original mortgagee? This inquiry is affected by a claim advanced by the plaintiffs that the mortgage, at the time of foreclosure, did not cover that part of the tract purchased by Edwards, and which is claimed by the plaintiffs. This objection depends upon the force and effect of the mortgage at the time it was created. The mortgage was taken by the Commissioner in Equity in behalf of the distributees of Benjamin Lucas from a purchaser of lands of the estate of Benjamin Lucas, sold under a decree for partition, as security for the purchase money of said lands. The purchaser was G. W. Lucas, and the lands embraced those purchased by Edwards under foreclosure proceedings, already referred to. The sale was made prior to February 11, 1862. G. W. Lucas and Charles Lucas were brothers, sons of Benjamin Lucas, and both entitled to distributive shares of the estate of their father. The mortgage was, therefore, in the hands of the Commissioner acting for the distributees of Benjamin Lucas, a purchase money mortgage, unaffected by any legal or equitable claim that might exist against G. W. Lucas, the purchaser and mortgagor.

The next question is as to the effect and operation of the mortgage as it regards the right of the mortgagee to have satisfaction out of the land. The land covered by the mortgage was sold in two separate parcels, each bringing a distinct price, and both were pur-

chased by G. W. Lucas. Two bonds were given by G. W. Lucas, the one covering the price of one of the lots, and the other bond the price of the other lot of land., A single mortgage was made by the purchaser, covering both lots of land, and conditioned for the payment of both these bonds.

The smaller of these bonds, together with the mortgage, was transferred by the Commissioner to J. F. Parrott, on account of the share of his wife in the estate, under whom the defendant Edwards claims, June 3, 1863. On or before the 11th day of February, 1862, the date of the sale to him, G. W. Lucas was appointed committee of Charles. The precise date of this appointment is in dispute, but need not be more accurately fixed.

On or about January 16th, 1863, the larger of the two bonds was transferred to G. W. Lucas as part of a settlement under which he received his individual share of the estate, and, as committee of Charles, the share of the latter in the estate. The transfer must be regarded as payment of this bond and an extinguishment *pro tanto* of the mortgage debt.

The facts that Parrott foreclosed this mortgage on account of the bond transferred to him and sold, and that Edwards purchased, have already been stated.

The question here arises, did the mortgage bind the two parcels of land included in it as security for the payment of both bonds, or is it to be regarded, as contended for by the plaintiff, as intended to secure each of these bonds separately on the respective lots in respect to which they were given? There is nothing to prevent a mortgage from operating at one and the same time on several distinct parcels of land so that all are bound for the mortgage debt. Nor is there any reason why two or more distinct obligations may not be secured by a mortgage. Whether such securities are convenient is a question for those who make them, and not for those who enforce them. That was the character of the present mortgage as far as its nature is disclosed by the record before us. The Circuit Judge concludes that the mortgage was several and as to each part of the mortgage debts a security for the corresponding lot of land, on grounds too dependent for their force on conjecture to have weight against the tenor of the mortgage. That a person dealing with the mortgage might, when affected by peculiar equities, be held to that principle in enforcing the mortgage is conceivable, but that result would not grow out of the proper construction of the

mortgage, but out of the nature of attending circumstances. It is clear that the mortgage in the hands of the Commissioner was a security covering both bonds by a lien on the two parcels of land, considered as a single fund. The extinguishment of one of these bonds by its redelivery to the obligor as part of a settlement of his and Charles's interest in the estate did not in any way affect the validity of the mortgage as a security for the bond that remained unpaid.

Was the mortgage in the hands of the Commissioner charged with any equity in behalf of Charles Lucas? The Commissioner was merely the hand of the Court; the mortgage money belonged to those entitled to take the estate of Benjamin Lucas, and the security was theirs. The interpolation of the name of the Commissioner changed none of the substantial rights of the parties. If, then, the bonds, had they been taken and secured in the names of the real parties in interest, would have been unaffected by any equity in behalf of Charles Lucas, then the title of the Commissioner is equally unaffected.

It is contended that G. W. Lucas, in purchasing the parcels of land, intended to make provision for an investment of the share of Charles coming from the estate. It is not pretended that he actually purchased in the name of Charles. The parcel of land in question was purchased with G. W. Lucas's bond, excepting a small amount of cash to cover costs and expenses. It does not appear that at the time of such purchase G. W. Lucas held any property or funds belonging to Charles. He had nothing in his hands to invest. This of itself is strong ground for holding that the original purchase of the tract was not intended as an investment in behalf of Charles. The Circuit Judge has, however, arrived at a contrary conclusion, but we do not find that that view has sufficient support from the evidence to overcome the conclusions that may arise from the form of the transaction and the circumstances and situation of the parties.

But assuming that it was the intention of G. W. Lucas, in purchasing the property in question, to place in the form of an investment for Charles one of these parcels of land, still such an intention was, at the time of the purchase, a mere unexecuted purpose. There was then no estate in his hands for any such investment. What might be the condition of things, when Charles's estate should actually come into his hands, could not be certainly known then.

It might happen that when that payment was made circumstances would render proper or expedient some different mode of investment for the estate of Charles. This lot, as it stood in the hands of G. W. Lucas previous to the payment to him of Charles's share of the estate, certainly was not charged with any equity in favor of Charles. The elements of such an equity are wanting. It was not purchased with Charles's money, for no funds of that character was in his hands. On the contrary, it was purchased with the money and credit of G. W. Lucas, and that established in him the beneficial interest to support his legal title.

This was the position of things when the mortgage was taken for the distributees of Benjamin Lucas's estate, and there can be no doubt that such mortgage was unaffected by any intention that G. W. Lucas may have had as to the future use he should make of the property. In fact, Charles Lucas was himself a distributee unsatisfied as to his share at the time the mortgage was taken, for it was part of the fund to which he looked for the payment of his share of the estate; and so far from his interest being with the mortgagor, it was altogether with the mortgagee.

Was any change effected by the subsequent transfer of the larger bond to G. W. Lucas? We will assume the view most favorable for the plaintiffs in looking at the question, and that was that the bond in question was received by G. W. Lucas as part of the share of Charles; the actual fact, in this respect, need not be determined. Among the distributable assets were two bonds secured by the mortgage. Charles takes one of these bonds and the other distributees the other. Had the bond been specifically assigned to Charles, it would not have affected in the slightest degree the liability of the whole land for the bond that still remained in the other distributees. The fact that it was indirectly assigned to Charles, though in form to G. W. Lucas, assuming it so to have been, would not produce any greater effect than a direct assignment to Charles.

The consequence was, that when Parrott took the bond, as representing one of the distributees, he took it with all the rights of those from whom he received it, and had full power to foreclose and sell both parcels of land, if that became necessary, and the purchaser, under such mortgage, unless affected by some equity collateral to and independent of the mortgage, would hold the land under a title as full as that of Benjamin Lucas during his lifetime.

Pursuing the assumption that the bond assigned to G. W. Lucas was really the property of Charles, it either became paid by operation of law in the hands of G. W. Lucas, by reason of his being the committee of Charles, or it did not. If it was paid, then it became cash in G. W. Lucas's hands, and the land, although to that extent discharged, from that bond, still remained held under that transferred to Parrott. Equity would not, without stronger reasons than the case presents, have considered that cash as invested in a tract of land mortgaged to a third person to secure the debt of the committee. Nor would it have been proper, while the mortgage was unsatisfied, for the committee to have placed Charles's interest in such shape that, in case of the default of the committee to pay the mortgage money, it might be destroyed through the operation of the mortgage. It was then the interest of Charles, as things stood, that the funds should be regarded as cash in the hands of G. W. Lucas for investment, secured by his bond as committee. But suppose that the bond was not to be considered as paid, in equity, but as a good obligation against G. W. Lucas belonging to Charles, and capable of being enforced against the land, through the mortgage in Parrott's hands, equity would, in that case, hold Parrott as a trustee for Charles, so far as his right to hold the mortgage security was affected by a part of the mortgage debt being outstanding in a third person. If Parrott chose to foreclose for the satisfaction of his bond, he could do so; but if it should happen that there was not a fund sufficient to pay both debts, and the whole land had been sold, then Charles would be permitted to come in for his share of the money realized on the sales of the property. In either case the purchaser under the mortgage would take a title as good as that of the mortgagee.

A purchaser under such a sale on foreclosure could safely purchase with full knowledge of all the transactions disclosed by the case before us, and yet obtain good title. Assuming Edwards to have had the fullest information, there was nothing to prevent him from obtaining full title to the lands purchased by him under the foreclosure of the Parrott mortgage. If all that is charged in respect to the defendant, Edwards, be true, he was still in the position of one purchasing from another who had acquired a legal title, without notice of an equity, and that was sufficient, without regard to what knowledge he possessed of the transactions.

It is clear that Edwards's title to the land purchased under the Parrott mortgage is unimpeachable on any legal or equitable ground presented by the case before us.

It only remains to consider the title of Edwards as it regards the one hundred and ninety-eight acres. This tract was embraced in the original mortgage given by, G. W. Lucas to the Commissioner, yet it was not sold upon the foreclosure of that mortgage. Shortly after G. W. Lucas purchased from the Commissioner, in February, 1862, he sold this one hundred and ninety-eight acre tract to Kirven, who gave him a mortgage for the purchase money. This mortgage was afterwards assigned to Edwards, and while in his hands was foreclosed, and Edwards became the purchaser.

If Kirven's title was good and unaffected by any equity existing in favor of Charles Lucas, then the title of Edwards is equally good. Kirven purchased and gave his mortgage previously to the settlement under which Charles's share must be regarded as paid into the hands of his committee. There were then no funds in the hands of the committee belonging to Charles to invest, and accordingly no investment can be regarded as having been made.

As has already been said with reference to the other mortgage, the land purchased by G. W. Lucas could not be regarded as an investment in behalf of Charles, for it was purchased wholly on G. W. Lucas's credit, and was covered by a mortgage for the whole purchase money on the sale of the two tracts. It does not appear that there was any clear value in this land, at that time, over and above the amount for which it stood mortgaged.

An attempt was made to prove that Kirven was informed at the time of his purchase that the purchase by G. W. Lucas was intended by him to form an investment for Charles. There is a conflict of testimony on this point, which the Circuit Judge has passed upon, holding Kirven subject to notice. But there is a fundamental difficulty in the way of affecting Kirven's title by the fact, even if G. W. Lucas made the statements attributed to him. It could amount to no more than a declaration of his intentions, at some future time, to place a part of the purchased land in the position of an investment for Charles. It was not in such a position at that time, for, as we must assume, it was mortgaged for all it was worth to pay G. W. Lucas's bonds; besides, G. W. Lucas did not hold at that time any part of the estate of Charles capable of investment. But whatever he may have understood, it is

evident, from the testimony, that he did not regard the 198 acres as included in that portion of the land which was intended as an investment for Charles. There is no evidence to charge Kirven with notice of any equity affecting his title to the 198 acres, and accordingly Edwards's legal title cannot be impeached on the ground of any equity in favor of Charles.

There is nothing in the case to show that at the time Edwards purchased such a state of facts existed as would have induced a Court of equity to decree that the land in question should constitute an investment for Charles. We must assume that the committee's bond for the faithful discharge of his office formed a better security than the land at that time. Assuming that equity might have set up the bond delivered to G. W. Lucas as the property of Charles, still that would not affect Edwards, who claims against that bond and not through it.

As Edwards purchased from parties having legal title, and unaffected by any equity, it is unnecessary to consider that portion of the evidence tending to show his knowledge of the state of relations between Charles and his committee.

It is equally unnecessary to consider the effect of the mortgage made by G. W. Lucas to Parker and Kelly, as it cannot affect the title derived by Edwards through the other mortgages covering the whole tract, and it does not appear that Edwards acquired anything under that mortgage that would not, under the circumstances, have passed into his hands under the mortgages already considered.

The judgment must be set aside and the cause remanded to the Circuit Court for a decree establishing the foregoing conclusions.

*Moses*, C. J., and *Wright*, A. J., concurred.